**AFFIDAVIT**

**STATE OF WEST VIRGINIA**
**COUNTY OF CABELL, to-wit:**

I, TODD A. BERRY, being duly sworn, do hereby depose and state as follows:

**INTRODUCTION**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property, a cellular telephone, which is currently in law enforcement possession, and the extraction of electronically stored information from that property described in Attachment B.

**BACKGROUND OF AGENT**

2. I am currently employed as a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed for over ten years. I am currently assigned to the Huntington, West Virginia, Resident Agency of the Pittsburgh Division, in the Southern District of West Virginia. As a Special Agent, I am authorized to investigate violations of the laws of the United States and to execute warrants issued under the authority of the United States. During the course of my employment with the FBI, I have participated in several investigations involving the Internet, email and electronically transferred files. I have investigated violations of federal law, including interstate

1

threats, and the online threats to cause serious bodily injury or death to another, particularly in relation to violations of Title 18, United States Code, Sections 875(c). I have participated in the execution of search warrants involving online threats and interstate violence offenses, and the search and seizure of computers and other digital devices related to those offenses. I work with other federal, state, and local law enforcement personnel in the investigation of crimes involving a communication in interstate commerce containing a threat to injure the person of another.

3. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE PROPERTY TO BE EXAMINED

4. The property to be searched is one (1) Apple Iphone 8 Plus cellular telephone, bearing International Mobile Equipment Identity ("IMEI") number 356774080007875 and Mobile Station International Subscriber Directory Number ("MSISDN") 16812454469, (the "subject cell phone"), Serial number F2LV5073JCM2. The subject cell phone is currently located at the FBI Huntington Resident Agency in Huntington, West Virginia. Through my involvement in this investigation, I know that the subject cell phone has been stored in a manner in which its content is, to the extent material to the investigation, in substantially the same state as it was when the subject cell phone

2

first came into the custody of the FBI. It came into the FBI's possession in the following way: on June 30, 2020, officers executed an arrest warrant issued from the Cabell County Courthouse in Huntington, West Virginia for Silas Thornton King in the parking lot adjacent to the Walmart in Hurricane, West Virginia, on June 30, 2020, King's cellular phone was seized from his person for the purpose of safekeeping evidence related to an investigation of a violation of 18 U.S.C. § 875(c) (Interstate transmission of a communication containing a threat to injure the person of another). King was read aloud the consent to search form for the above cellular phone which he refused to sign. King's phone was transported to FBI Huntington Resident agency for safe keeping until being transferred to FBI Charleston Resident Agency, to be entered into evidence until a search warrant is obtained. Once a search warrant is obtained, the data will be extracted by a Senior Forensic Examiner to parse the data to be reviewed. The Senior Forensic Examiner will then generate a report for the case agent to review.

## STATUTORY AUTHORITY

5. This investigation concerns violations of 18 U.S.C. § 875(c), transmitting a communication in interstate commerce containing a threat to injury the person of another as follows:

**DEFINITIONS**

6. The following definitions apply to this Affidavit and Attachment B:

   a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

   b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

   c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device

4

designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can

      work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

  f. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

7. Based on my training, experience, and research, I know that the subject cell phone has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. Further based upon my training and experience, I know that data stored on devices of this type can reveal, among other things, who has possessed or used the subject cell phone.

## CELL PHONE STORAGE AND FORENSIC ANALYSIS

8. Based on my knowledge, training, and experience, I know that cell phones can store information for long periods of time. This information may include sites visited or data accessed via the Internet, which can sometimes be recovered using forensics tools.

9. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described in the warrant, but also forensic evidence that establishes how the subject cell phone was used, the purpose of its use, who used it, and when.

6

There is probable cause to believe that this forensic electronic evidence might be on the subject cell phone because:

a. Data on a cell phone can provide evidence of a file that was once on the cell phone but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a cell phone can also indicate who has used or controlled the cell phone. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how a cell phone works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how the cell phone was used, the purpose of its use, who used it, and when.

d. The process of identifying the information used to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a cell phone is evidence may depend on other information stored on the cell phone and the application of knowledge about how a cell phone functions. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a cell phone was used, who used it, and when, sometimes it is necessary to establish that certain data is not present on a cell phone.

f. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the instant warrant would permit the examination of the subject cell phone. The examination may require authorities to employ techniques, including but not limited to, computer-assisted scans of the entire medium that might expose many parts of the subject cell phone to human inspection in order to determine whether it is evidence described by the warrant.

10. Because this warrant seeks only permission to examine the subject cell phone already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Therefore, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

### BACKGROUND OF INVESTIGATION AND PROBABLE CAUSE

11. I am currently assigned to the threats against law enforcement investigation of **SILAS THORNTON KING** who made threats of physical violence to sworn law enforcement officers of the Milton Police Department located in Milton, West Virginia. On or about June 28, 2020, he posted a Snapchat video, username "silasking02," with his "handle" "OPG" which depicts a video of **SILAS THORNTON KING** as he verbally threatens with the intent to kill, injure, harass, or intimidate officers of the Milton Police Department. During this time, **SILAS THORNTON KING** was also utilizing his cellular telephone to send the threatening video via Snapchat. This message consisted of the following but are not limited to: "$530 dollars cause I smoke weed, yea I fucking forgot, I fucking forgot that it was legal in the state right fucking next to me right. Sorry Milton, sorry you have no fucking money and your fucking broke as fuck, you wanna know why, because your town fucking sucks, it sucks fucking cock and every single one of you

8

mustache having mother fucking cops can suck my fucking cock, I don't give a fuck, I swear to God if I saw any of you out and I have the opportunity to fucking shoot one right through your fucking neck I fucking would, I swear to fuck I would." The video threat starts with a visual of a person holding a citation and then the video depicts **SILAS THORNTON KING's** face and partial upper body while inside a vehicle.

4. The following information was obtained from investigative reports and the interview of Officer Higginbotham: Due to the previous charge of possession of marijuana and the incident listed above, an arrest warrant was issued for **SILAS THORNTON KING** from the Magistrate Court of Cabell County, West Virginia, wherein **SILAS THORNTON KING** was charged with terroristic threats.

5. By way of background, on June 30, 2020 Officer Higginbotham advised during a traffic stop on Sunday, June 28, 2020 at approximately 11:42 p.m., he identified the front seat passenger of the vehicle as **SILAS THORNTON KING** via **KING's** West Virginia Photo Driver's License number F949059. During the stop, Officer Higginbotham detected an odor of marijuana emitting from the vehicle and ascertained from the occupants if any marijuana was present. **SILAS THORNTON KING** indicated there was and removed marijuana from the front passenger door and handed it to the driver, who then handed it to Officer Higginbotham. Officer

9

Higginbotham subsequently issued **SILAS THORNTON KING** a misdemeanor citation for possession of marijuana and possession of paraphernalia found in a backpack within the vehicle, which **SILAS THORNTON KING** claimed ownership of during a subsequent search.

6. On June 30, 2020, SA Berry played the video of the threat posted on Snapchat by username "silasking02" to Milton Police officers for Officer Higginbotham. Officer Higginbotham identified the male in the video making the threat to be **SILAS THORNTON KING**. Officer Higginbotham recognized **SILAS THORNTON KING's** voice and face due to the previous traffic stop he had just conducted on June 28, 2020 where he identified **SILAS THORNTON KING** via his driver's license photo and from the conversation he had with **SILAS THORNTON KING** during the traffic stop. Officer Higginbotham also identified the clothing depicted in the video to appear to be the same shirt worn by **SILAS THORNTON KING** during his interaction with him on the traffic stop.

7. On June 30, 2020, **SILAS THORNTON KING** was located in the parking lot adjacent to his place of employment, Walmart, in Hurricane, West Virginia, by members of the West Virginia State Police, Hurricane Police Department, Milton Police Department and the FBI. **SILAS THORNTON KING** was transported to the West Virginia State Police Winfield Detachment for processing. The arresting officer was instructed by the duty Putnam County Magistrate to take **SILAS THORNTON KING** to the Western Regional Jail after

10

processing where he would be arraigned later that evening. **SILAS THORNTON KING** acknowledged and signed his Miranda Rights and advised he was upset from receiving a citation for possession of marijuana that he could not pay for and the fact that he was the only person to receive a citation in the vehicle. He stated that he "flew off the handle." **SILAS THORNTON KING** advised when the cop let them leave the traffic stop he told the driver to hurry and pull out because if he did not, the cop was going to hear him "lose it." **SILAS THORNTON KING** admitted to posting the video on Snapchat and remembered saying mean things about police officers and threatening them with a gun. **SILAS THORNTON KING** further stated he remembered saying in the video something about shooting cops in the neck. **SILAS THORNTON KING** advised upon watching the video it made him scared and realized that everyone who watched the video would feel scared.

16. Based on the aforementioned factual information, your Affiant respectfully submits there is probable cause to believe violations of 18 U.S.C. §§ 875(c) have been committed and that evidence of those violations is contained on the subject cell phone.

17. Based on the foregoing, your Affiant respectfully requests that this Court issue a search warrant authorizing the

11

examination of the subject cell phone described in Attachment A to seek the items described in Attachment B.

_____
TODD A. BERRY
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Subscribed and sworn to before me on the 8th day of July, 2020.

_____
CHERYL A. EIFERT
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA